UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UMG RECORDINGS, INC., <br><br> Plaintiff, <br><br> v. <br><br> TROY AUGUSTO, et al., <br><br> Defendants. <br><br> AND RELATED COUNTER-CLAIMS. | NO. CV 07-03106 SJO (AJWx) <br><br> **ORDER GRANTING COUNTER-DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO COUNTER-CLAIM** [Docket No. 37]; **DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY ON COMPLAINT** [Docket No, 40]; **AND GRANTING IN PART AND DENYING IN PART DEFENDANT AND COUNTER-CLAIMANT'S MOTION FOR SUMMARY JUDGMENT** [Docket No. 43] |

This matter is before the Court on Counter-Defendant UMG Recordings, Inc.'s ("UMG") Motion for Summary Judgment as to Counter-Claim, Plaintiff UMG's Motion for Summary Judgment as to Liability on Complaint, and Defendant and Counter-Claimant Troy Augusto's Motion for Summary Judgment, all filed April 7, 2008. Both parties filed Oppositions and Replies in all instances. The Court found these matters suitable for disposition without oral argument and vacated the hearings set for May 5, 2008. *See* Fed. R. Civ. P. 78(b). For the following reasons, Counter-Defendant UMG's Motion is GRANTED, Plaintiff UMG's Motion is DENIED, and Defendant and Counter-Claimant Augusto's Motion is GRANTED IN PART and DENIED IN PART.

I.   BACKGROUND

Most of the facts in this case are undisputed. UMG owns the copyright to numerous songs and produces CDs containing those songs. A majority of those CDs are created for sale to the

public. Before a new CD is released for sale to the public, UMG often creates and distributes a "promotional CD" for purposes of promoting and advertising the release of the new CD. The promotional CD is similar to the new CD, although a promotional CD may contain fewer songs and may not include the artwork included with the new CD. In addition, all promotional CDs are labeled with the following language:[1]

> This CD is the property of the record company and is licensed to the intended recipient for personal use only. Acceptance of this CD shall constitute an agreement to comply with the terms of the license. Resale or transfer of possession is not allowed and may be punishable under federal and state laws.

UMG sends these promotional CDs to music industry insiders who are in a position to provide publicity and exposure for the upcoming commercial release of the new CD.

Augusto is not one of these insiders. Yet, he obtained numerous promotion CDs from music shops and online auctions. Augusto then sold many of UMG's promotional CDs through online auctions on eBay, advertising these promotional CDs as rare collectibles not available in stores. UMG sent Augusto a cease and desist letter, notifying Augusto that UMG believed his sale of these promotional CDs infringed UMG's copyrights. UMG also notified eBay – through eBay's Verified Rights Owner program ("VeRO") – of its belief that Augusto's auctioning of UMG promotional CDs infringed UMG's copyrights. This led eBay to temporarily stop Augusto's auctions and to suspend Augusto's eBay account. Eventually, eBay reinstated Augusto's account.

When Augusto continued to sell UMG promotional CDs, UMG brought suit against Augusto for copyright infringement, alleging that UMG retained the exclusive right to distribute and sell the promotional CDs that Augusto sold through eBay (the "Promo CDs"). Augusto brought a counter-claim against UMG for violation of § 512(f) of the Digital Millennium Copyright Act (the "DMCA"),

---

[1] Not all promotional CDs contain this exact language. For example, some promotional CDs merely state: "Promotion Use Only – Not for Sale." (Kossowicz Decl. Ex. 11.) Yet, the parties agree that this more succinct language does not differ in meaning from the verbose version. (Benjamin Dep. 37.)

alleging that UMG knowingly misrepresented to eBay that Augusto's auctions infringed UMG's copyrights so that eBay would stop Augusto's auctions.

Now, both parties move for summary judgment on UMG's copyright infringement claim and Augusto's counter-claim for violation of § 512(f).

## II.  DISCUSSION

Summary judgment is proper only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A "material" fact is one that could affect the outcome of the case, and an issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the Court "construes the evidence in the light most favorable to the nonmoving party." *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005).

### A.  UMG's Claim for Copyright Infringement

UMG and Augusto both seek summary judgment on UMG's copyright infringement claim. To establish a prima facie case of copyright infringement, UMG must show: (1) UMG owns a copyright; and (2) Augusto violated one of the exclusive rights granted to UMG as owner of that copyright under 17 U.S.C. § 106. *See LGS Architects, Inc. v. Concordia Homes*, 434 F.3d 1150, 1156 (9th Cir. 2006).

Here, Augusto does not dispute that UMG has met its initial burden. UMG established that it owns the copyright to sound recordings embodied in the Promo CDs (Kossowicz Decl. ¶¶ 2-3; Kossowicz Ex.10) and that Augusto sold these Promo CDs through eBay (McDevitt Decl. ¶ 4; McDevitt Decl. Ex. 6) in violation of UMG's exclusive right to sell copies of those sound recordings to the public, *see* 17 U.S.C. § 106(3).

Augusto argues, however, that his conduct is protected by the "first sale doctrine."

1. <u>The First Sale Doctrine Permits the Owner of a Copy to Resell that Copy</u>.

The first sale doctrine limits a copyright owner's exclusive right to distribute copies of a copyrighted work to the public: "[T]he owner of a particular copy or phonorecord lawfully made under [Title 17 of the United States Code] . . . is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord." 17 U.S.C. § 109(a); *see also* 2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8.12[B][1][a] (2008) [hereinafter *Nimmer*] ("Section 109(a) provides that the distribution right may be exercised solely with respect to the initial disposition of copies of a work, not to prevent or restrict the resale or other further transfer of possession of such copies.").

Although this statutory limitation is commonly referred to as the first sale doctrine, its protection does not require a "sale." The doctrine applies after the "first authorized disposition by which title passes." 2 *Nimmer* § 8.12[B][1][a]. This passing of title may occur through a transfer by gift. *See* 4 William F. Patry, *Patry on Copyright* § 13:15 ("Since the principle [of the first sale doctrine] applies when copies are given away or are otherwise permanently transferred without the accoutrements of a sale, 'exhaustion' is the better description."); 2 Paul Goldstein, *Goldstein on Copyright* § 7.6.1 n.4 (3d ed.) ("[A] gift of copies or phonorecords will qualify as a 'first sale' to the same extent as an actual sale for consideration.").

To invoke the first sale defense for his sale of UMG Promo CDs, Augusto must show: (1) the CDs were lawfully manufactured with UMG's authorization; (2) UMG transferred title to the CDs; (3) Augusto was the lawful owner of the CDs; and (4) Augusto disposed of, but did not reproduce, the CDs. 2 *Nimmer* § 8.12[B][1][a] ("An affirmative answer to each question validates the defense. Failure to qualify under any prong dooms it.").

Here, two of these elements are undisputed. The parties agree that the Promo CDs were lawfully manufactured (UMG Answer ¶ 13) and Augusto is accused only of selling the Promo CDs, not of reproducing them (UMG Compl. ¶ 10).

The remaining two elements hinge on one question: Did UMG transfer title to the music industry insiders when it mailed them the Promo CDs? If the answer is yes, then UMG transferred

ownership of the CDs and Augusto lawfully owned the CDs at the time he sold them,[2] which permitted Augusto to sell the CDs under the first sale doctrine. If the answer is no, then UMG retained title to, and ownership of, the CDs and Augusto was not the lawful owner of those CDs at the time he sold them, which excludes Augusto's actions from the protection of the first sale doctrine.

        2.        <u>Because UMG Transferred Title to the Music Industry Insiders, Augusto Was the Owner of the Promo CDs at the Time He Sold Them</u>.

Augusto argues that he owned title to the particular copies of the Promo CDs that he sold under three theories: (1) the licenses on the Promo CDs are not valid; (2) the music industry insiders may treat the Promo CDs as a gift under federal law; and (3) UMG abandoned the Promo CDs under California law. If Augusto succeeds on any of these three arguments, the first sale doctrine protects his actions. The Court addresses each argument in turn.

        a.        <u>The Licensing Language on the Promo CDs Does Not Create a License</u>.

Each of the Promo CDs bore a label with words that purportedly "license" use of that Promo CD to the music industry insider receiving it. (Kossowicz Decl. Ex. 11.) UMG argues that these words create a license between UMG and any recipient who accepts the Promo CD and that under this license UMG retains title to the Promo CD. Augusto argues that these words do not create a license and that UMG's distribution of the Promo CDs qualifies as a gift or sale.

In determining whether a transaction is a sale or a license, courts must analyze the "economic realities" of the transaction. *Microsoft Corp. v. DAK Indus.*, 66 F.3d 1091, 1095 (9th Cir. 1995). "[T]he fact that the agreement labels itself a 'license' . . . does not control our analysis." *Id.* at 1095 n.2.

---

[2] UMG argues that Augusto should have to trace the chain of title from him back to UMG. This is incorrect. By showing that UMG transferred ownership of the Promo CDs to the music industry insiders, Augusto would show that UMG no longer has a copyright interest in the Promo CDs, which is sufficient under the first sale doctrine.

        i.      One Hallmark of a License Is the Owner's Intent to Regain Possession.

The right to perpetual possession is a critical incident of ownership. *See Krause v. Titleserv, Inc.*, 402 F.3d 119, 123 (2d Cir. 2005) (describing a person's "degree of ownership of a copy" as "complete" when "he may lawfully use it and keep it forever, or if so disposed, throw it in the trash").[3] Accordingly, the distributor of a copyrighted product's intent to regain possession is strong evidence that the product was licensed, not sold, to the recipient. The absence of this intent is strong evidence that the product was sold.

The Ninth Circuit's decision in *United States v. Wise* demonstrates the importance of regaining possession of the licensed product. 550 F.2d 1180 (9th Cir. 1977). In *Wise*, the court evaluated several contracts under which movie studios transferred movie prints. Most of the contracts required that the recipients return the movie prints after a fixed term. *Id.* at 1185 ("The license agreements with respect to the films involved in this case generally . . . required their return at the expiration of the license period."). The Ninth Circuit determined that these contracts were licenses.

However, some of the contracts permitted the recipient to keep the film print. In particular, one contract allowed an actress to keep possession of the film print "at all times" for her "personal use and enjoyment," but prevented her from transferring the print to anyone else. *Id.* at 1192. The Ninth Circuit determined that this contract was a sale, not a license.

Here, UMG gives the Promo CDs to music industry insiders, never to be returned. The recipients are free to keep the Promo CDs forever. Nothing on the packaging of the Promo CDs or in the licensing label requires that the recipient return the Promo CDs to UMG. (Kossowicz Decl. Ex. 11.) There are no consequences for the recipient should she lose or destroy the Promo CDs – which UMG allegedly considers its property. (Kossowicz Decl. Ex. 11.) UMG does not request that any recipients return the Promo CDs (Strouse Decl. ¶ 9) and does not otherwise make any

---

[3] While the licensing label would not permit the music industry insiders to throw the Promo CDs "in the trash," the economic reality of the transfer entirely permits them to do so "if so disposed." *See Krause*, 402 F.3d at 123.

affirmative effort to recover possession of the Promo CDs.[4] Further, it appears that UMG could not take these actions; UMG does not keep permanent records identifying who received which Promo CDs. (Strouse Decl. ¶ 7.)

Accordingly, the music industry insiders' ability to indefinitely possess the Promo CDs is a strong incident of ownership through a gift or sale.

      ii. <u>The Absence of a Recurring Benefit to UMG Suggests the Transfer to Music Industry Insiders Is a Gift or Sale</u>.

Generally, licenses provide recurring benefits for the copyright owner. *Microsoft*, 66 F.3d at 1096 (determining that Microsoft sold its software to DAK in part because Microsoft received a set payment independent of DAK's length of use of the software); *see also SoftMan Prods. Co. v. Adobe Sys.*, 171 F. Supp. 2d 1075 (C.D. Cal. 2001) (determining that Adobe sold its software in part because "the license runs for an indefinite term without provisions for renewal").

Here, UMG receives no recurring benefit from the recipients' continued possession. As an initial matter, UMG has no guarantee that it will receive any benefit from the distribution of a Promo CD. The licensing label does not require that the recipient promote or expose the material on the Promo CD. (To the contrary, most of the Promo CDs at issue contain a label with the phrase "for personal use only," indicating that any license would prohibit the recipient from making professional use of the Promo CD.) Nor does the licensing label require the recipient to provide UMG with any benefit to retain possession. At the time UMG distributes the Promo CDs, it is not guaranteed to get anything in return.

      iii. <u>The Only Apparent Benefit to a License Is to Restrain Trade</u>.

Finally, the only benefit to a license for UMG is to restrain transfer of its music. This purpose was rejected 100 years ago by the Supreme Court. *See Bobbs-Merrill Co. v. Strauss*, 210 U.S. 339 (1908) (rejecting a book publisher's attempt to restrict resale of a book through a label that prohibited sales for less than one dollar); *see also RCA Mfg. Co. v. Whiteman*, 114 F.2d 86,

---

[4] UMG does passively receive Promo CDs returned by the postal service as undeliverable or returned by recipients as unwanted. (Strouse Decl. ¶ 10(a).) Rather than keep these Promo CDs as an asset, UMG destroys them. (Strouse Decl. ¶ 10(a).)

90 (2d Cir. 1940) (Hand, J.) ("[RCA] had no power to impose the pretended servitude upon [its] records [by placing a 'Not Licensed for Radio Broadcast' label upon them]."); *SoftMan*, 171 F. Supp. 2d at 1084 ("Adobe frames the issue as a dispute about the ownership of intellectual property. In fact, it is a dispute about the ownership of individual pieces of Adobe software.").

Unlike the use of software, which necessitates a license because software must be copied onto a computer to function, music CDs are not normally subject to licensing. Therefore, the benefits of a license for software do not exist under these facts.

Looking to the economic realities of the transaction, UMG's distribution of Promo CDs provides the recipient with many critical rights of ownership, including the right to perpetual possession and the freedom from obligations to UMG. Accordingly, UMG's distribution of Promo CDs to the music industry insiders is properly characterized as a gift or sale, not a license, and title to the CDs transferred to the insiders. Augusto is thus protected by the first sale doctrine.

### b. The Promo CDs Are a Gift Under Federal Law.

Augusto also argues that UMG transferred title to the Promo CDs to the music industry insiders under federal law. The Postal Reorganization Act prohibits "the mailing of unordered merchandise" without "the prior expressed request or consent of the recipient." 39 U.S.C. § 3009(a), (c).[5] This merchandise "may be treated as a gift by the recipient, who shall have the right to retain, use, discard, or dispose of it in any manner he sees fit without obligation whatsoever to the sender." 39 U.S.C. § 3009(b). "The purpose of [§ 3009] was to 'control the unconscionable practice of persons who ship unordered merchandise to consumers and then trick or bully them into paying for it.'" *Kipperman v. Academy Life Ins. Co.*, 554 F.2d 377, 379 (9th Cir. 1977).

---

[5] Section 3009 is not limited to merchandise mailed through the United States Postal Service. 65 Fed. Reg. 2867, 2868 n.8 (Jan. 19, 2000) ("[Section 3009] refers to 'mailing' of unordered merchandise. [Prohibition of this] practice[] is not limited to unordered merchandise distributed through the U.S. mail."). Accordingly, the Promo CDs shipped through private services, such as UPS, are also subject to § 3009.

Here, UMG's actions fall within the plain text of § 3009. UMG mails merchandise – the Promo CDs – to music industry insiders without their "prior expressed request or consent."[6] Still, UMG argues that § 3009 does not apply to their mailing of the Promo CDs because § 3009: (1) applies only to merchandise received by "consumers"; (2) applies only to merchandise for which payment is requested; and (3) does not nullify agreements between the mailer and the recipient.

i. <u>Even If § 3009 Applies Only to Consumers, the Music Industry Insiders Are Consumers</u>.

Although the text of § 3009 references only "recipients" of unordered merchandise, UMG argues that the statute protects only "consumers" of that merchandise. For support, UMG relies on one decision from the California Court of Appeals and a consent order from the Federal Trade Commission ("FTC"), the agency charged with enforcing § 3009.

In *Blakemore v. Superior Court*, a cosmetics company sent unordered merchandise to its independent sales representatives and then charged those representatives for the merchandise. 27 Cal. Rptr. 3d 877, 889 (Ct. App. 2005). The California Court of Appeals construed § 3009 as applying to "the mailing of unordered merchandise by the seller to the consumer of that merchandise, not to parties who have contracted with each other to promote the sale of the same merchandise to third persons." *Id.* at 888. Because the sales representatives were not consumers, § 3009 did not prohibit the cosmetics company's actions. *Id.* at 890.

The FTC has also suggested that the statute's protection does not extend beyond consumers. In a consent order issued nearly 30 years ago, the FTC enjoined a light bulb company from violating § 3009. *In re Commercial Lighting Prods., Inc.*, 95 F.T.C. 750 (1980). Yet, that consent order carved out non-consumers from the injunction's scope. *Id.* (enjoining the light bulb company from mailing unordered merchandise to "Persons" and excluding from the definition of

---

[6] UMG claims this fact is in dispute. However, the declarations it cites as support provide no evidence that the music industry insiders have provided prior expressed consent to receive the Promo CDs. (*See, e.g.*, Strouse Decl. ¶ 3 (identifying the type of person who receives a Promo CD, but providing no evidence of prior expressed consent).)

1  "Persons" any person or entity "which does not purchase said Products for consumption,"
2  specifically identifying "independent jobbers" and "wholesalers" as exempt).
3       If the "consumer" requirement is read into § 3009, this Court must decide whether the music
4  industry insiders are consumers. Certainly, these insiders are not the exempted non-consumers
5  of the kind specifically identified in *Blakemore* and *Commercial Lighting*. Sales representatives,
6  jobbers, and wholesalers all pass the physical product on to purchasers. By contrast, music
7  industry insiders consume the Promo CD just as any other purchaser would, by listening to it. The
8  reason these insiders are selected to receive the Promo CD is because they are not just
9  consumers, they are consumers with influence.
10      Accordingly, the music industry insiders are consumers.
11                     ii.    <u>Section 3009 Does Not Apply Only to Merchandise for Which
12                            Monetary Payment Is Requested</u>.
13      Second, UMG argues that § 3009 does not apply, because it does not request monetary
14 payment for the merchandise. Yet, the plain text of the statute does not include such a
15 requirement. Instead, UMG relies on cases finding that offers of a service are not prohibited by
16 § 3009. *See, e.g.*, *Kashelkar v. Rubin & Rothman*, 97 F. Supp. 2d 383, 395 (S.D.N.Y. 2000) ("[The
17 defendant] did not send [the plaintiff] any merchandise – it sent him an offer to open a line of
18 credit, which he was free to accept or reject.").
19      Here, recipients of the Promo CDs are not "free to accept or reject" the terms of the license.
20 UMG's mailing of the Promo CDs puts a recipient in a similar position as a recipient of
21 merchandise for which the seller requests payment. Each recipient must return the item or face
22 some affirmative obligation. The music industry insiders must physically return the Promo CD or
23 make arrangements to keep it for all time because disposing of the Promo CD would violate
24 UMG's property interest in the Promo CD.
25      Accordingly, enforcement of the license printed on the Promo CDs is no different in principle
26 than enforcement of a request for payment.
27
28

### iii. UMG Did Not Create an Agreement By Mailing the Promo CDs to Music Industry Insiders with a Licensing Label.

Finally, UMG argues that § 3009 does not apply because the Promo CDs "contained an express license." (Opp'n to Augusto MSJ 10.) For support, UMG relies on a case in which the Third Circuit stated that "§ 3009 does not explicitly declare any agreements to be void." (Opp'n to Augusto MSJ 10 (quoting *Wisniewski v. Rodale, Inc.*, 510 F.3d 294, 295-96 (3d Cir. 2007)).)

This reliance is misplaced. In *Wisniewski*, the defendant sent the plaintiff unordered merchandise. The plaintiff paid for that merchandise "to avoid damage to his credit rating," then later brought suit under § 3009. *Id.* at 296. The Third Circuit found that § 3009 did not create a private right of action. *Id.* at 307. As a corollary to this holding, if the plaintiff was induced into completing the contract by the defendant's unordered merchandise, § 3009 did not void that contract. *Id.* at 306.

UMG compares *Wisniewski* to the facts of this case, arguing that the music industry insiders accepted the licensing contract by keeping the merchandise and that § 3009 does not void this licensing contract. This comparison is incorrect for two reasons. First, the Ninth Circuit reached a conclusion contrary to *Wisniewski* in *Kipperman*, where the court determined that § 3009 did create a private right of action for monetary damages. 554 F.2d at 380. Accordingly, the recipient is "able to bring suit to obtain a judicial declaration of [her] rights and, when necessary, to secure restitutionary relief." Second, UMG mistakes the music industry insider's actions – keeping the Promo CDs – as accepting the license, when those actions are perfectly consistent with treating the merchandise as a gift. In fact, those music industry insiders whose Promo CDs ultimately ended up in Augusto's possession affirmatively refuted the license agreement by transferring possession to somebody else, an act prohibited by UMG's license language.

Accordingly, the Promo CDs are unordered merchandise subject to § 3009. By sending the Promo CDs to music industry insiders, UMG transferred title to those insiders and the Promo CDs are subject to the first sale doctrine.

        c.    UMG Did Not Abandon its Promo CDs.

Augusto also argues that UMG abandoned the Promo CDs under California law. To show that UMG abandoned the Promo CDs, Augusto must demonstrate: (1) UMG does not possess the Promo CDs; and (2) UMG intended to abandon the Promo CDs. 1 Cal. Jur. 3d *Abandonment* § 2. Here, UMG concedes that it does not possess the Promo CDs, leaving only UMG's alleged intent to abandon in dispute.

Intent to abandon is determined based on "consideration of all the circumstances of the case," including all "acts of ownership and dominion, or a want of such acts." *Moon v. Rollins*, 36 Cal. 333, 338-40 (1868). "Abandonment may arise from a single act or a series of acts." *Pickens v. Johnson*, 238 P.2d 40, 45 (Ct. App. 1951). One has intent to abandon when one relinquishes possession "without any present intention to repossess." *Utt v. Frey*, 106 Cal. 392, 397 (1895).

Yet, abandonment "requires something more than mere 'passivity.'" *William Wolff & Co. v. Canadian Pac. Ry. Co.*, 123 Cal. 535, 538 (1899). There "must be some clear and unmistakable affirmative act or series of acts indicating an intention to relinquish ownership." 1 Cal. Jur. 3d *Abandonment* § 14. In addition, "[t]here is no such thing as an abandonment to particular persons . . . ." *McLeran v. Benton*, 43 Cal. 467, 476 (1872). The owner "must leave [the property] free to the occupation of the next comer, whoever he may be . . . ." *Moon*, 36 Cal. at 338.

Here, Augusto shows only passivity. UMG has simply made no attempt to reclaim the merchandise to which it attempts to retain title. UMG has not affirmatively disavowed its rights to the Promo CDs, and in fact prints on the Promo CDs that it retains title. Finally, any abandonment of a Promo CD by UMG would be to a particular person, the recipient of the Promo CD, not the public at large.

Accordingly, UMG did not abandon the Promo CDs under California law.

    3.    Augusto's Actions Are Protected by the First Sale Doctrine.

Because title to the Promo CDs transferred from UMG to the music industry insiders, Augusto's resale of those CDs is protected by the first sale doctrine. Augusto is entitled to summary judgment on UMG's claim for copyright infringement.

B.    Augusto's Counter-Claim for Violation of § 512(f)

page

1    UMG and Augusto both seek summary judgment on Augusto's counter-claim under the DMCA. Section 512(c) of the DMCA permits copyright owners to provide Internet hosts notice of potential copyright infringement. In order to curb abuse of this "notice and takedown provision," Congress "included an expressly limited cause of action for improper infringement notifications, imposing liability only if a copyright owner's notification is a 'knowing misrepresentation.'" *Dudnikov v. MGA Entm't, Inc.*, 410 F. Supp. 2d 1010, 1017 (D. Colo. 2005) (quoting *Rossi v. Motion Picture Ass'n of Am.*, 391 F.3d 1000, 1004-05 (9th Cir. 2004)).

Under § 512(f) of the DMCA, a copyright owner may be held liable for damages caused by an erroneous invocation of the notice and takedown provision only if the owner did not possess a subjective good faith belief that its copyright was being infringed. *Rossi*, 391 F.3d at 1004; *see also* S. Rep. No. 105-90, at 49 (1998) ("[Section 512(f)] is intended to deter knowingly false allegations to service providers.").

Here, UMG demonstrates that it had a subjective good faith belief that Augusto was infringing its copyrights. UMG and its agents carefully documented Augusto's actions in preparation for this lawsuit. (McDevitt Decl. ¶ 4.) UMG was aware that Augusto had entered into a consent judgment in a previous case, in which Augusto admitted that selling promotional CDs violated the owner's copyright. (Benjamin Decl. ¶ 6(e).). Further, the language on the Promo CDs led UMG to believe that it could enforce its copyrights against an unauthorized seller of those CDs. (Benjamin Decl. ¶ 6.) Augusto's allegations that UMG should have known better do not create a genuine issue of material fact as to this issue given the uncertainty of the law in this area.

Accordingly, UMG is entitled to summary judgment on Augusto's counter-claim. *See Dudnikov*, 410 F. Supp. 2d at 1018 (granting summary judgment in copyright owner's favor based on declaration of counsel in charge of notifying eBay of potential infringement).

III.  RULING

Augusto's actions are protected under the first sale doctrine. Accordingly, Plaintiff UMG's Motion is DENIED and Augusto's Motion is GRANTED as to UMG's copyright infringement claim.

1  UMG held a subjective good faith belief that Augusto was infringing its copyrights.
2  Accordingly, Counter-Defendant UMG's Motion is GRANTED and Augusto's Motion is DENIED
3  as to Augusto's counter-claim for violation of § 512(f) of the DMCA.
4  IT IS SO ORDERED.
5  Dated this 10th day of June, 2008.                    /S/ S. James Otero

                                                                                     S. JAMES OTERO
                                                  UNITED STATES DISTRICT JUDGE